3McCLENDON, J.
This is a medical malpractice case arising from the death of Catherine Alphonse, a seventy-five year old patient of North Oaks Medical Center in Hammond, Louisiana. Named as defendants are Acadian Ambulance Service, Inc. (Acadian), and Leslie Pray and Chad Dauzat, the two emergency medical technicians employed by Acadian and involved in the transport of Ms. Alphonse from North Oaks Medical Center to North Oaks Rehabilitation Center, an extended care facility, also in Hammond.
Finding that the evidence does not support the trial court’s findings that the alleged breach of defendants’ standard of care caused Ms. Alphonse’s demise, or lessened her chance of survival, we reverse.
FACTS AND PROCEDURAL HISTORY
On May 13, 1996, Ms. Alphonse was transferred from Belle Maison Nursing Home, her residence of eight years, to North Oaks Medical Center. Ms. Alphonse was admitted to the hospital and diagnosed with severe, intractable nausea and vomiting, possible starvation, and numerous other health maladies including, diabetic ketoacidosis, rheumatoid arthritis with Felt/s syndrome, hypothyroidism, diverticulitis, multiple endocrine neoplasia syndrome # 1, left nephrectomy with left staghorn calculus removal, hiatal hernia with esophageal reflux, and multiple drug allergies.
On May 17, 1996, Ms. Alphonse had an acute fall in her blood pressure and was put on an intravenous (IV) drip of Dopamine to maintain pressure. On May 18, 1996, at the request of her family, the drip of Dopamine was terminated. By May 23, 1996, Ms. Alphonse was nonresponsive, in a coma and was having difficulty breathing. She was receiving oxygen by nasal cannula. She could not take anything by mouth, 14and the wishes of the family were to not use a feeding tube. Additionally, at the request of her family, there was a “Do Not Resuscitate” (DNR) order in place.[2] As Ms. Alphonse’s condition was terminal, the decision was made to transfer her to the skilled nursing unit at North Oaks Rehabilitation Center. Ms. Alphonse’s diagnosis at that time included bronchitis-staphylococcus aureus beta lactamase positive, congestive heart failure, chronic renal failure, insulin-dependent diabetes mellitus, multiple endocrine neoplasia II *297 syndrome, rheumatoid arthritis, anemia, osteoporosis, transient ischemic attacks/cerebrovascular accident, urinary tract infection-streptococcus species with candida albicans, fractured right hip, hypothyroidism, and glaucoma.
Acadian was called to transfer Ms. Alphonse from North Oaks Medical Center to North Oaks Rehabilitation Center. Pray and Dauzat, emergency medical technicians with Acadian, responded to the request and made the transfer. It is undisputed that Pray and Dauzat discontinued Ms. Alphonse’s oxygen when they moved her from her hospital room to the ambulance. However, whether oxygen was administered in the ambulance for the seven-minute ride to the extended care facility, is disputed. Following the transfer, Ms. Alphonse was unloaded from the ambulance and placed in the care of North Oaks Rehabilitation Center. At that time, she was no longer breathing.
Plaintiffs, Lawrence Alphonse, Walter Alphonse, Cathy Faucheux, and the succession of Catherine Alphonse, each filed separate claims against Acadian, Pray and Dauzat, pursuant to the Louisiana Medical Malpractice | RAct.[3] LSA-R.S. 40:1299.41, et seq. Subsequently, the medical review panel, convened pursuant to the Act, reviewed the ease and rendered a decision. As the medical panel could not determine whether Ms. Alphonse was placed on oxygen during the transport in the ambulance unit, the panel determined that there was a material issue of fact not requiring expert testimony bearing on liability.[4] See LSA-R.S. 40:1299.47G.
Following the panel’s decision, three of Ms. Alphonse’s children filed suit individually, and a suit was also filed on behalf of the succession of Catherine Alphonse. Each lawsuit alleged that the treatment of Ms. Alphonse by the defendants was below the standard of care required of them, which resulted in the death of Ms. Alphonse. The plaintiffs also pled in each of their petitions, all filed on October 28, 1999, that the damages cfaimed were not of such an amount requiring a trial by jury.[5] Defendants answered each of the petitions generally denying their allegations and further asserting that they were entitled to a trial by jury as the claims of plaintiffs arose from a single event, i.e., the death of Catherine Alphonse. Defendants further pled the exception of no right of action in their answer to the petition of the Succession of Catherine Alphonse, alleging that the Succession of Catherine Alphonse was not the proper party to assert the claims arising from the death of Catherine Alphonse. On November 18, |fi1999, plaintiffs filed a motion to consolidate in each of the four lawsuits, which motion was granted on January 28, 2000.
The trial of the consolidated matters was held on September 13, 2000. Reasons for Judgment were signed on March 15, *298 2001. In said reasons, the trial court stated:
This court specifically finds the discontinuing of the use of oxygen by Dauzat and Pray for a period of approximately thirty minutes was a significant cause of her death. If Ms. Alphonse had continued to receive oxygen as ordered by her treating physician, she would have survived for at least some period beyond the negligent acts of Pray and Dauzat. Removing her supply of oxygen clearly took from Ms. Alphonse any chance of survival.
The trial court then determined, considering all relevant evidence in the record, and the stipulation by plaintiffs that no individual claim would exceed the threshold necessary for a jury trial, that $50,000.00 was an appropriate award of damages for Ms. Alphonse’s loss of chance of survival. The trial court farther stated that according to Smith v. State, Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, damages for the loss of a chance of survival were the only item of damages at issue before the court and it was therefore prohibited from consideration of any claim for damages for loss of consortium and the like, which would normally be brought by the legal survivor of the malpractice claim. Therefore, in its written reasons, the trial court rendered judgment in favor of the plaintiffs collectively and against the defendants in the amount of $50,000.00, for Ms. Alphonse’s loss of chance of survival.[6]
Thereafter, on March 26, 2001, plaintiffs filed a Motion for Reconsideration of the written reasons for judgment requesting the trial court to reconsider its reasons for judgment to award each individual plaintiff wrongful death damages and “LeJeune” damages. The trial court, 17on reconsideration, in new reasons for judgment, signed on August 20, 2001, determined:
The facts presented support a finding by this court that had Ms. Alphonse been provided the proper treatment, namely the administration of oxygen she would have survived for some short indeterminate period beyond the negligent acts of the defendants. The withholding of the oxygen was the cause of Ms. Alphonse’s demise. Her pre-existing condition did not cause her death.
Accordingly, the trial court held that it was in error when it opined that the Smith case controlled. The trial court then found that the only limiting factor in the determination of damages was the stipulation that any award of damages would not exceed the jury threshold, i.e., $50,000.00. The trial court found that the evidence supported the maximum award for each of the four plaintiffs. Therefore, the trial court signed its judgment on August 28, 2001, awarding each plaintiff the amount of $50,000.00 in damages, for a total of $200,000.00.[7]
It is from this August 28, 2001 judgment that defendants appeal, raising nine assignments of error:
1. The trial court erred by concluding that Acadian’s employees, Pray and Dau-zat, withheld the use of oxygen on Ms. Alphonse for approximately 30 minutes.
2. The trial court erred by concluding that Acadian breached the standard of care owed to Ms. Alphonse.
3. The trial court erred by concluding that the discontinuation of the use of oxy *299 gen by Pray and Dauzat was a significant cause of Ms. Alphonse’s death.
4. The trial court erred by concluding that if Ms. Alphonse had continued to receive oxygen, she would have survived for at least some period beyond the|snegligent acts of Pray and Dauzat, thereby taking away from Ms. Alphonse any chance of survival.
5. The trial court erred by concluding that an award of $50,000.00 would be an appropriate award of damages for Ms. Alphonse’s loss of chance of survival.
6. The trial court erred by concluding, on reconsideration, that the trial court was originally in error when it opined Smith v. State, Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, controlled.
7. The trial court erred by concluding that plaintiffs were entitled to wrongful death damages and “Lejeune” type damages.
8. The trial court erred by concluding, on reconsideration, that each of the four plaintiffs appealing was entitled to the maximum damage award of $50,000.00.
9. The trial court erred by awarding the Succession of Catherine Alphonse damages for wrongful death and survivorship claims.
DISCUSSION
Medical malpractice is defined by LSA-R.S. 40:1299.41A.(8) as:
any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
LSA-R.S. 40:1299.41A.(7) sets forth the duty of health care providers:
(7) “Tort” means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his |9profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
Acadian, as an ambulance service, was therefore required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession in the same community or locality, and also to use reasonable care, diligence and judgment.[8]
Thus, in suits alleging medical malpractice, the plaintiff must prove the applicable standard of care, the breach of that standard, and that the substandard care caused an injury that the plaintiff otherwise would not have suffered. Pfiffner v. Correa, 94-0992, pp. 7-8 (La.10/17/94), 643 So.2d 1228, 1233; Hoot v. Woman’s Hosp. Found., 96-1136, p. 5 (La.App. 1 *300 Cir. 3/27/97), 691 So.2d 786, 789, writ denied, 97-1651 (La.10/3/97), 701 So.2d 209.
In this matter, plaintiffs allege that Ms. Alphonse’s life was abruptly and unnaturally ended by oxygen deprivation caused by the Acadian personnel. The trial court agreed with plaintiffs and held that the deprivation of oxygen was a “significant cause” of Ms. Alphonse’s death. The trial court awarded $50,000.00 for Ms. Alphonse’s loss of chance of survival. Plaintiffs subsequently argued that Smith v. State, Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, did not prohibit wrongful death damages in this matter asserting that this was not a case where the patient had a less-than-even chance of survival, but for the malpractice. On reconsideration, the trial court again agreed with plaintiffs finding that Ms. Alphonse’s pre-existing condition did not cause her death, but rather “the withholding of oxygen was the cause of Ms. Alphonse’s demise.” The trial court then supplemented its award and awarded each of Imthe plaintiffs $50,000.00 for Ms. Alphonse’s wrongful death and/or lost chance of survival.
In Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986), the supreme court recognized the right of a victim to recover damages for the loss of a chance of survival, although that chance is a less-than-even chance because of a preexisting condition. Hastings held that the defendant’s conduct must increase the risk of the patient’s harm to the extent of being a substantial factor in causing the result, but need not be the only cause. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d at 720.
It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival in these lost chance of survival cases. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1278 (La.1991). The plaintiff need only prove that the patient had a chance of survival and that his or her chance of survival was lost as a result of the defendant’s negligence. Smith v. State, Dep’t of Health and Human Resources Admin., 523 So.2d 815, 820 (La.1988).
The supreme court in Smith v. State, Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, further clarified these loss of a chance of survival cases and addressed the proper measure of damages. The court stated that allowing recovery for the loss of a chance of survival is not a change or a relaxation of the usual burden of proof by a preponderance of the evidence. Rather, allowing such recovery is a recognition of the loss of a chance of survival as a distinct compen-sable injury caused by the defendant’s negligence, to be distinguished from the loss of life in wrongful death cases, and there is no variance from the usual burden in proving that Indistinct loss. Smith v. State, Dep’t. of Health and Hosps, 95-0038, p. 6 (La.6/25/96), 676 So.2d 543, 547.
The court in Smith acknowledged that full recovery for survival and wrongful death damages are not available for deprivation of a chance of survival of less than fifty percent and stated that to allow full recovery would ignore plaintiffs inability to prove by a preponderance of the evidence that the malpractice victim would have survived but for the malpractice, which is a requirement for full recovery. Therefore, a lost chance of survival because of medical malpractice caused by a defendant’s negligence was recognized as a distinct compensable injury, valued as a lump sum based on all the evidence in the record. Smith v. State, Dep’t. of Health and Hosps., 95-0038 at p. 7, 676 So.2d at 547.
*301 Thus, in a medical malpractice case seeking damages for the loss of a less-than-even chance of survival because of negligent treatment of a pre-existing condition, the plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence and that the tortfeasor’s action or inaction deprived the victim of all or part of that chance, and must further prove the value of the lost chance, which is the only item of damages at issue in such a case. Smith v. State, Dep’t. of Health and Hosps., 95-0038 at p. 6, 676 So.2d at 547.
In this case, in order to recover damages for a breach of the standard of care applicable, the plaintiffs must either prove that Ms. Alphonse would have survived but for the‘ alleged malpractice or, for the lost chance of survival action, that Ms. Alphonse had a chance of survival and that the defendants’ conduct increased the risk of harm to Ms. Alphonse to the extent of being a substantial factor in causing her death.
| ^Pray, an EMT paramedic, testified that she did not receive any information about Ms. Alphonse requiring oxygen before the transport to the extended care facility. Her records indicated that she and Dauzat arrived at the hospital at 1:06 p.m. and departed at 1:43 p.m. They arrived at the extended care facility at 1:50 p.m. Pray also testified she reviewed Ms. Alphonse’s chart and the physician’s orders and there was no note with respect to oxygen. There was something in the physician’s orders about the IV. However, observing that the patient was on oxygen, Pray spoke to the nurse about both the oxygen and the IV. When Pray and the nurse could not find an order for the oxygen in the chart, the nurse told her about the notation in the chart to take measures to make the patient as comfortable as possible.[9] Pray stated to the nurse that she was going to get the portable oxygen canister for the transfer of Ms. Alphonse to the ambulance, but the nurse explained to Pray that that was not necessary. The nurse explained Ms. Alphonse’s condition, and that the oxygen was just to make the patient comfortable. Pray therefore decided to disconnect the oxygen to transfer Ms. Alphonse from the hospital room to the ambulance. When Ms. Alphonse was loaded into the ambulance, Pray testified that the oxygen was reconnected.[10] Pray further testified that she thought that a reasonable amount of time that the patient was without oxygen was three minutes.
Dauzat testified that Ms. Alphonse was disconnected from the oxygen in her hospital room right before she was transferred to the ambulance and that the walk from the room on the first floor to the ambulance unit was no |1smore than three to five minutes. He stated that he saw the oxygen connected in the ambulance.
Ms. Alphonse’s daughter, Cathy Fau-cheux, on the other hand, testified that she did not see the oxygen being administered in the ambulance. Ms. Faucheux rode in the back of the ambulance with her mother as she was being transferred to the extended care unit. Ms. Faucheux’s testimony, however, was inconsistent. Despite *302 testifying that she did not see oxygen administered in the ambulance, she testified that she went to Acadian’s office in Hammond to speak to someone about the transport, and at that time.spoke with Dwain Meche. She further testified, in connection with her conversation with Mr. Meche, as follows: “I asked him why was it not— she not given oxygen from the room to the ambulance.” Ms. Faucheux made no mention or complaint regarding the administration of oxygen in the ambulance.
Dr. Laughlin Winkler, Ms. Alphonse’s treating physician and an expert in the field of internal medicine, testified that Ms. Alphonse was a very frail lady with many health problems. When she entered the hospital on May 13,1996, she came in with severe nausea, vomiting and she was dehydrated. Dr. Winkler testified that she ordered oxygen by nasal cannula for Ms. Alphonse. Dr. Winkler testified that a nasal. cannula is the device used for patients, who although may need oxygen, are in the least or lesser states of respiratory distress. When the patient slipped into a coma and the decision was made to transfer Ms. Alphonse, it was Dr. Winkler’s intention to continue the oxygen from the hospital through transportation and at the rehabilitation center. Dr. Winkler testified that the oxygen request was on the discharge summary. The record reveals, however, and Dr. Winkler admitted on cross-examination, that although the oxygen request was on her [ udischarge summary, the summary was dictated by Dr. Winkler on May 23, 1996, and not transcribed until May 25, 1996, two days after Ms. Alphonse’s death. Additionally, the physician’s orders of May 23, 1996, made no mention of oxygen, but did include a notation to provide comfort measures to the patient.
Dr. Winkler also stated that she believed that in a patient like Ms. Alphonse, the deprivation of oxygen for three to four minutes could cause or significantly contribute to her deterioration. However, Dr. Winkler admitted that the patient’s condition was terminal. Ms. Alphonse had sepsis and was never expected to regain consciousness. Dr. Winkler stated that Ms. Alphonse was faced with death, but not necessarily imminent. On cross-examination, she was asked:
Q. Doctor, isn’t it true that notwithstanding whether this patient had oxygen or not, she had no chance of survival at the time that she was wheeled down the hall on that stretcher out into the Acadian ambulance unit to be transported over to North Oaks? Isn’t it true she had no chance of survival?
A. That is correct.
Q. And isn’t it true notwithstanding whether this patient had oxygen or not, when that patient arrived at the rehab center, that patient had no chance of survival?
A. That is correct.
Therefore, Dr. Winkler admitted that Ms. Alphonse had no chance of survival.
Dr. Charles Genovese, an expert in the field of internal medicine, also testified. He served on the medical review panel about this incident and was of the opinion that it was not a breach of the standard of care for the defendants to transport Ms. Alphonse without oxygen from her hospital bed to the waiting ambulance. He agreed with the nurse that the oxygen was not necessary for the transport. He believed she was very close to death at the time of being transported. His best guess was that she had “hours, a day, not|1sdays, not weeks.” Dr. Genovese did not think that administering oxygen in this case would have made any difference, as it was his belief that Ms. Alphonse’s multiple terminal problems “actually killed the patient.”
Dr. Edmund Vinci, also an expert in internal medicine, testified by deposition. *303 He served on the medical review panel with Dr. Genovese. He read the orders for transfer and they did not include oxygen. Dr. Vinci thought it was definitely reasonable that the defendants did not use oxygen in the transfer to the ambulance if the orders were not there. Dr. Vinci testified that this patient was terminal. The patient was going to die no matter what was done. Her death was imminent, meaning it could have happened at any time and oxygen was not going to correct any of Ms. Alphonse’s conditions. She was in septic shock and was already at the point of no return. Based on his opinion, he would have expected her to die that day.
All three medical experts, whose testimony or deposition appears of record, agreed that Ms. Alphonse’s condition was terminal. Thus, prior to any actions or inactions by the defendants in this matter and, in fact, prior to their summons and arrival, Ms. Alphonse had no chance of survival. Nothing in the record suggests that oxygen would have provided Ms. Alphonse a chance of survival that she otherwise would not have had. Even if oxygen might have secured for the patient a few hours of continuing life, all three experts agreed that Ms. Alphonse was in an unresponsive coma and never expected to regain consciousness. This is not the sort of “survival” anticipated by our jurisprudence. See Clark v. City of Shreveport, 31,407, 31,649, p. 4 (La.App. 2 Cir. 1/20/99), 726 So.2d 1042, 1044, writ denied, 99-0502 (La.4/1/99) 742 So.2d 872.
|1fiThus, even if we were to assume that the trial court had a reasonable basis to conclude that the applicable standard of care required of the defendants, Acadian, Pray and Dauzat, was established and that the evidence showed a breach of that standard, no reasonable basis exists to support a finding that Ms. Alphonse would have survived but for the alleged breach, or that Ms. Alphonse’s chance of survival was lost as a result of the alleged breach, as Ms. Alphonse incontrovertibly had no chance of survival. We find no evidence to support a conclusion that had oxygen been administered during the transport from the hospital bed to the ambulance, that Ms. Alphonse’s outcome would have been any different.
We conclude that the findings of the trial court are manifestly erroneous and the trial court was clearly wrong in finding that the alleged fault of the defendants caused Ms. Alphonse’s death or that Ms. Alphonse had a chance of survival, and that the alleged breach lessened that chance.[11]
Ms. Alphonse had no chance of survival at the time of the alleged malpractice, as testified to by all three medical experts, nor have plaintiffs established that Ms. Alphonse would have survived but for the alleged negligence. Clearly, plaintiffs were required to establish one of these two distinct burdens of proof in order to recover damages for the death of Ms. Alphonse. They established neither. We need not therefore address defendants’ remaining assignments of error regarding damages. Nor is it necessary to address defendants’ peremptory exception of no right of action directed to the plaintiff, Succession of Catherine Alphonse.
|17C0NCLUSI0N
We find that the actions of defendants were not a substantial cause of Ms. Al *304 phonse’s death, nor did they lessen her chance of survival, as Ms. Alphonse had no chance of survival. Accordingly, the judgment of the trial court on August 28, 2001, awarding each of the four plaintiffs $50,000.00, is reversed. Plaintiffs’ lawsuits are dismissed at their costs.
REVERSED AND RENDERED.

. A written DNR order had been in her medical charts for over five years.

. Lawrence Alphonse, Walter Alphonse and Cathy Faucheux are three of the children of Catherine Alphonse.

. The panel additionally determined:
It is clearly not a breach in the standard of care that the patient was not placed on oxygen for the brief period of transport from bedside to the ambulance unit.
Notwithstanding whether oxygen was placed, the patient was irreversibly faced with imminent death due to multiple medical problems which by consensus of family and health care providers were no longer being addressed. The patient had septic shock, diabetic coma, terminal malnutrition, severe anemia, dehydration and acute renal failure, all of which were certain to lead to her imminent demise. None of these would have improved by the administration of oxygen.

.The right to a trial by jury is available in a suit where a plaintiff’s cause of action exceeds $50,000.00. See LSA-C.C.P. art. 1732.

. The trial court did not differentiate how its award was to be allocated among the four plaintiffs.

. It is noted that the trial court never addressed the issue of whether the Succession of Catherine Alphonse was a proper party plaintiff in this matter.

. Ambulance service is included in the definition of "health care provider.” See LSA-R.S. 40:1299.41A.(1).

. Multi-disciplinary discharge instructions dated May 23, 1996, contained the notation "02 at 2LNC”, but the multi-disciplinary discharge instructions are not physician’s orders and Pray testified that she never saw the multi-disciplinaiy discharge instructions in the chart.

. This testimony was corroborated by the documentation in the transport record filled out by Pray at the time of the transfer.

. A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of "manifest error” or unless it is "clearly wrong.” Stobart v. State, Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993), citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).