STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2019 CA 1043

WILFRED ALLRIDGE AND JUANIKA ALLRIDGE

VERSUS

WILLIAM H. ST. MARTIN, MD

Judgment rendered **DEC 0 7 2021**

* * * * *

On Appeal from the
Thirty-Second Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
No. 178306, Div. "D"

The Honorable David W. Arceneaux, Judge Presiding

* * * * *

| | |
|---|---|
| David W. Ardoin<br>H. Carson McKowen<br>Thibodaux, Louisiana<br>Mark D. Plaisance<br>Marcus J. Plaisance<br>Prairieville, Louisiana | Attorneys for Plaintiffs/Appellants<br>Wilfred and Juanika Allridge |
| Jacob K. Best<br>Stephen M. Pizzo<br>Metairie, Louisiana | Attorneys for Defendant/Appellee<br>William H. St. Martin, MD |

* * * * *

**BEFORE: McCLENDON, WELCH, THERIOT, HOLDRIDGE AND WOLFE, JJ.**

Holdridge J. dissents with reasons

Wolfe J. dissents without reasons

**MCCLENDON, J.**

In this medical malpractice action, plaintiffs, Wilfred Allridge and Juanika Allridge ("the Allridges"), appeal a judgment rendered in favor of defendant, Dr. William H. St. Martin, dismissing their wrongful death and survival claims with prejudice. For the reasons more fully discussed herein, we reverse and remand to the trial court for a new trial.

## BACKGROUND

On October 8, 2013, 16-year-old Caleb Allridge injured his knee at football practice. His brother, Wilfred "P.J." Allridge, III, brought him to Dr. St. Martin's office for evaluation on October 21, 2013. Dr. St. Martin, a family physician, treated P.J. previously, having served as the team physician at the school where P.J. played football. During that visit, Caleb's vital signs were taken, including blood pressure, heart rate, and weight. All vital signs were normal. Based on his examination of Caleb's knee and his suspicion of an anterior cruciate ligament ("ACL") tear, Dr. St. Martin scheduled an MRI for Caleb. He also advised him to take ibuprofen for pain and swelling, to continue using crutches, and to return to the office in one week to discuss the MRI results.

The MRI was completed on October 29, 2013. On the morning of October 31, 2013, Caleb's mother, Juanika Allridge, telephoned Dr. St. Martin's office to schedule an appointment because Caleb was sick. P.J. accompanied Caleb to the appointment and was present during Dr. St. Martin's examination of Caleb. It is undisputed that neither Dr. St. Martin nor his office staff took or recorded certain vital signs during the October 31st visit. Dr. St. Martin's medical assistant recorded Caleb's weight but did not check Caleb's blood pressure, heart rate, or respiratory rate. Dr. St. Martin also failed to check these vital signs. Dr. St. Martin claimed that he did, however, examine Caleb's heart and lungs with a stethoscope, and

2

while he did not record an actual number for Caleb's heart rate or respiratory rate, he testified that his examination revealed Caleb's heart rate and respiratory rate to be normal at the time of the visit. It is also undisputed that Dr. St. Martin failed to examine Caleb's knee at the time of the visit. However, the nature of Caleb's complaints to Dr. St. Martin that day, the manner in which Caleb presented to Dr. St. Martin during the examination, and the extent of Dr. St. Martin's examination that day are all disputed. According to Dr. St. Martin, Caleb complained of sinus problems and Dr. St. Martin's examination revealed that Caleb had a sinus infection. P.J., however, stated that Caleb never complained of sinus issues; instead, P.J. testified that both he and Caleb informed Dr. St. Martin that Caleb was experiencing shortness of breath.

After leaving Dr. St. Martin's office at approximately 5:30 p.m., Caleb's family participated in a neighborhood party for Halloween. According to the family, Caleb stayed inside during the event playing video games. The next morning, P.J. picked up Caleb and Mrs. Allridge and brought them to Mrs. Allridge's parents' home, as Mrs. Allridge was recovering from a surgery and was not able to care for Caleb. According to P.J., Caleb was gasping for air that morning and continued to complain of shortness of breath. Later that morning, Caleb went into the bathroom and collapsed on the floor. Caleb died at 12:35 p.m. on November 1, 2013, from a massive pulmonary embolism post-knee injury.

## PROCEDURAL HISTORY

The Allridges claimed that Dr. St. Martin's negligence resulted in the death of their son, and their malpractice claim was submitted to a Medical Review Panel (MRP). The MRP concluded that there was a material issue of fact, not requiring an expert opinion, bearing on liability for consideration by a court. Specifically, the MRP concluded that there was a question of fact as to how Caleb presented to

3

Dr. St. Martin on October 31, 2013. The MRP noted the absence of recorded vital signs and the discrepancy between the parties regarding Caleb's respiratory status at that visit.

Thereafter, the Allridges filed this medical malpractice lawsuit against Dr. St. Martin. The Allridges alleged that Caleb visited Dr. St. Martin on October 31st because he was having difficulty breathing, and despite Dr. St. Martin's knowledge of Caleb's knee injury and the fact that the MRI showed a moderate to large hemarthrosis (bleeding) of the left knee, Dr. St. Martin treated Caleb for a cold, did not conduct even a minimal examination of Caleb, did not take Caleb's vital signs, and did not check Caleb's respiration or heartbeat. The Allridges alleged that Dr. St. Martin breached the standard of care by, among other things, failing to take vital signs in a patient seen urgently for shortness of breath and difficulty breathing, failing to diagnose the pulmonary embolism, failing to undertake appropriate diagnostic procedures, and failing to treat Caleb for a deep vein thrombosis (DVT) and a potential pulmonary embolism. Claiming that Dr. St. Martin's breach of the standard of care caused Caleb's untimely death, the Allridges sought to recover wrongful death damages pursuant to La. C.C. art. 2315.2 and Caleb's own damages pursuant to La. C.C. art. 2315.1.

A four-day jury trial was held, during which Dr. St. Martin and members of his staff, numerous medical experts, and members of Caleb's family testified. The medical testimony established that Dr. St. Martin failed to take or record certain vital signs during the October 31st visit and that the failure to take vital signs on a patient who has a medical condition constituted a breach of the standard of care. However, the expert testimony was conflicting over whether the failure to take or record Caleb's vital signs that day caused Caleb's death or deprived him of a chance of surviving the fatal pulmonary embolism. The conflict was rooted in a

4

determination as to whether Caleb exhibited signs of respiratory distress during Dr. St. Martin's examination. The medical testimony established that if Caleb had exhibited signs of respiratory distress during the visit, then Dr. St. Martin should have suspected that Caleb would be at risk for developing a DVT or a pulmonary embolism and should have initiated further medical testing to determine if Caleb had these conditions, and his failure to do so would constitute a breach of the standard of care in his treatment of Caleb.

Prior to the conclusion of the evidence, the trial court presented the parties' attorneys with a proposed jury verdict form, which included specific jury interrogatories regarding (1) whether the jury found Dr. St. Martin breached the standard of care in his treatment of Caleb; (2) whether that breach of the standard of care caused Caleb's death; and (3) if so, the damages to which the Allridges were entitled. The Allridges' attorney objected to the second interrogatory on causation, arguing that the causation interrogatory should have asked whether the breach of the standard of care resulted in a loss of the chance of Caleb surviving the fatal event. The attorney argued that the burden of proving the loss of a chance of survival was less stringent than the burden of proving wrongful death. Despite this objection, the jury interrogatory was not altered to include the requested language.

The court instructed the jury on the causation element of the Allridges' claims as follows:

> ...In a medical malpractice action a plaintiff does not have to show that the defendant's conduct was the only cause of the harm or that there were no other possible causes, but he must show by a preponderance of the evidence that he suffered the injury because of the defendant's conduct.

> Under Louisiana law there may be more than one legal cause of an injury. In order to prove that Dr. St. Martin's conduct caused all or some of the damage claimed, the plaintiffs need only prove by a

preponderance of the evidence that Dr. St. Martin's fault increased the risk of harm to Caleb Allridge such that it was a substantial factor causing his death. Dr. St. Martin may be found at fault even if his fault was not the sole cause of the harm sustained by Caleb Allridge.

If you decide that the plaintiffs have proved their case by a preponderance of the evidence, you must decide the question of whether there has been damage to the plaintiffs, and, if so, the amount of that damage.

* * *

If you find that Dr. St. Martin breached his duty to Mr. Allridge and that the breach of that duty caused Caleb Allridge's death, then the plaintiffs are entitled to compensation for the damages sustained which were caused by the fault of Dr. St. Martin.

Claims have been made in this case by Caleb Allridge's parents for their own damages caused by the death of Caleb Allridge. When a child dies through the fault of another, the law authorizes an award of what is known as "wrongful death" damages to the parents for their pain and suffering and loss of love, affection and companionship. Damages for wrongful death may include compensation for loss of a chance of survival.

After deliberating, the jury returned a verdict in which it answered "Yes" to the first question on the verdict form, finding by a preponderance of the evidence that Dr. St. Martin breached the applicable standard of care regarding his medical treatment of Caleb. The verdict form instructed the jury to proceed to the second question if it answered "Yes" to the first question. As to the second question, which asked, "Do you find that any breach of the standard of care by William H. St. Martin, MD, caused the death of Caleb Allridge?" the jury answered "No." The verdict form instructed the jury to not answer any other questions if it answered "No" to question two, so that concluded the jury's deliberations. The verdict form instructed the jury that if it answered "Yes" to the second question, to proceed to question three, which asked what sums of money, if any, the Allridges were entitled to recover for each of the following categories of damages: Survival Damages for Conscious Pain and Suffering of Caleb Allridge; Wrongful Death

6

Damages for Wilfred Allridge; Wrongful Death Damages for Juanika Allridge; and Special Damages. Question three did not include a line item for damages for lost chance of survival. However, since the jury answered "No" to question two regarding whether the breach of the standard of care caused Caleb's death, it did not address question three.

The Allridges filed a motion for judgment notwithstanding the verdict, or alternatively, a motion for new trial. Therein, they argued that the jury verdict form precluded the jury from considering whether Dr. St. Martin's malpractice resulted in or caused Caleb to suffer a lost chance of survival. The Allridges claimed that the jury verdict form permitted only a finding as to whether Dr. St. Martin's malpractice caused Caleb's death, which placed an unrealistic burden of proof on them. According to the Allridges, they presented overwhelming evidence that Dr. St. Martin caused Caleb to suffer a loss of a chance of survival by failing to take Caleb's vital signs on October 31st, and upon finding a breach of the standard of care, no reasonable juror could have found that Dr. St. Martin did not reduce Caleb's chance of surviving the fatal event. They also asserted that the trial court's jury instruction that damages could be awarded for loss of a chance of survival as a component of the wrongful death claim did not cure the fundamental defect in the jury verdict form.

On October 30, 2018, the trial court signed a judgment denying both motions. This appeal by the Allridges followed. The Allridges submit that although the jury correctly found that Dr. St. Martin breached the standard of care in his treatment of Caleb, the trial court erred by failing to include an interrogatory as to causation for lost chance of survival on the jury verdict form. They urge that the jury interrogatories failed to adequately set forth the issues to be decided by omitting a key legal principle and theory of recovery. Alternatively, the Allridges

7

posit that, even if a lost chance of survival was not a separate theory of recovery, the trial court erred in failing to include a damages category for lost chance of survival.

## JURY VERDICT FORM

Pursuant to La. C.C.P. art. 1812, a trial court is given wide discretion in determining and framing the issues to be posed as special interrogatories, and absent an abuse of that discretion, a court will not set aside those determinations. **Schram v. Chaisson**, 2003-2307 (La. App. 1st Cir. 9/17/04), 888 So.2d 247, 251. In reviewing a jury verdict form, this court employs a manifest error, abuse of discretion test. **Townes v. Liberty Mutual Insurance Company**, 2009-2110 (La. App. 1st Cir. 5/7/10), 41 So.3d 520, 527. It is well-settled that a verdict form may not be set aside unless the form is so inadequate that the jury is precluded from reaching a verdict based on correct law and facts. **Abney v. Smith**, 2009-0794 (La. App. 1st Cir. 2/8/10), 35 So.3d 279, 283, writ denied, 2010-0547 (La. 5/7/10), 34 So.3d 864. Jury interrogatories must fairly and reasonably point out the issues to guide the jury in reaching an appropriate verdict. **Id.** If the verdict form does not adequately set forth the issues to be decided by the jury, such as omitting an applicable essential legal principle or is misleading or confusing, such interrogatories may constitute reversible error. **Id.**

In order to determine whether the jury interrogatory on causation was so inadequate that it precluded the jury from reaching a correct verdict on the law and facts in this case, we shall first examine the evidence submitted to the jury.

## THE EVIDENCE

The medical evidence established that vital signs include a patient's weight, height, blood pressure, pulse rate, respiratory rate, and temperature. Vital signs also may include pain levels and can include measurement of oxygen saturation in

8

a patient exhibiting signs of respiratory distress. The evidence also showed that risk factors for developing a DVT in the lower extremity include a traumatic injury to the bones or a joint, obesity,[1] and immobility for a period of time. Symptoms of a DVT include swelling of the lower extremity, pain in the thigh or calf, and redness or warmth in the lower extremity. Additional symptoms of a pulmonary embolism include shortness of breath; difficulty breathing; gasping for air; chest pain; and abnormal vital signs, including decreased blood pressure or "up and down" blood pressure, an increased heart rate, an increased breathing or respiratory rate, an increased body temperature, and a low oxygen saturation level measured by a pulse oximeter.

Two doctors who served on the MRP reviewing Dr. St. Martin's treatment of Caleb on October 31st, Dr. Kevin Russ and Dr. James Tebbe, Jr., were accepted by the trial court as experts in family practice medicine. They testified at trial and explained that the MRP was unable to determine whether Dr. St. Martin breached the standard of care in this case because there existed a material issue of fact bearing on liability as to how Caleb presented to Dr. St. Martin during the October 31st visit due to a discrepancy between the parties regarding Caleb's respiratory status during the October 31st visit. According to the doctors, whether Dr. St. Martin committed malpractice could only be determined by finding that Caleb was in respiratory distress at the time of the visit, a determination that could only be made depending on whose version of the October 31st visit one believed.

At trial, Dr. Russ testified that taking vital signs is a standard of care for a "sick" visit, and if Dr. St. Martin was treating Caleb for an illness and did not take his vital signs, that constituted a breach of the standard of care. He further opined that the failure to take vital signs on Caleb was a breach of the standard of care if

---

[1] The record reflects that Caleb weighed almost 300 pounds.

9

Caleb presented that day complaining of shortness of breath. Dr. Russ stated that if Caleb was not in any sort of respiratory distress during the examination, he suspected Caleb's vital signs probably would have been normal.

According to Dr. Russ, if a patient is short of breath and in respiratory distress, a doctor should consider whether the patient has a DVT or a pulmonary embolism. He noted that, once a pulmonary embolism is discovered, most patients do well if treatment begins while they are stable; however, a pulmonary embolism may occasionally present a sudden death situation. Dr. Russ agreed that most patients who are diagnosed with the condition are likely to survive.

Dr. Russ stated that there are different patterns for the occurrence of a pulmonary embolism; sometimes patients present with complaints of symptoms such as shortness of breath for two or three days, some complain of shortness of breath starting that day, and in some cases, the presentation is sudden death. Dr. Russ acknowledged that sometimes there are absolutely no precipitating clinical signs or symptoms of a pulmonary embolism, which can occur suddenly and without warning. He agreed that the description of Caleb's pulmonary embolism in the autopsy, as one large clot extracted from both pulmonary arteries as well as the heart, is consistent with an acute serious event. Dr. Russ further stated that while not taking vital signs on a sick patient is a breach of the standard of care, he was unable to say whether the failure to take vital signs in this case reduced the likelihood of a good outcome for Caleb. He explained, "I'm just saying that had [Caleb's vital signs] been abnormal there would have been a better chance to continue evaluation." Dr. Russ testified that Caleb's MRI revealed that Caleb had a hemarthrosis in the knee. Dr. Russ stated that a hemarthrosis is bleeding into a joint, which he acknowledged is similar to a bruise. He opined that the fact that

10

someone has a hemarthrosis is not in and of itself a risk factor for developing a DVT.

Dr. Tebbe, on the other hand, admitted that Caleb was at risk for the development of a DVT based on Caleb's soft tissue injury above and below his knee. He was unsure if the DVT was present on the October 31st visit, but he surmised it might have been. Dr. Tebbe testified that if there was a complaint of shortness of breath, Dr. St. Martin should have examined Caleb's leg to rule out a potential DVT. Dr. Tebbe acknowledged that if Caleb presented to Dr. St. Martin's office on October 31st with a non-fatal pulmonary embolism, typically one would expect him to have shortness of breath that continually worsened. Like Dr. Russ, Dr. Tebbe testified that if Caleb was not having problems breathing during Dr. St. Martin's examination, Caleb's vital signs would have been normal; however, if Caleb was having trouble breathing, there is a likelihood his vital signs would have shown something different.

As was the case before the MRP, the jury was presented with conflicting evidence as to whether Caleb exhibited signs of respiratory distress during Dr. St. Martin's October 31st examination of Caleb. P.J., who arrived at Dr. St. Martin's office prior to the October 31st examination of Caleb, testified that Caleb told him he felt like he had water in the back of his throat and was experiencing shortness of breath. Although P.J. reported that Caleb was "gasping for air" in an earlier deposition, he testified at trial that he only saw Caleb gasp "a little" and he could barely tell that Caleb was having breathing problems. P.J. also testified that Caleb, who was generally light-skinned, had a noticeable change in color, which he described as "darkish" or "gray."

According to P.J., while he and Caleb were sitting on a bench waiting to go into Dr. St. Martin's examination room, a nurse approached and asked Caleb what

11

was wrong. P.J. insisted that Caleb told the nurse that he had shortness of breath and never mentioned the word "sinus." P.J. testified that, upon Dr. St. Martin's arrival in the examination room, Dr. St. Martin inquired what was wrong with Caleb, and Caleb reported that he had shortness of breath and felt like he had water in the back of his throat. P.J. stated that he repeated these symptoms to Dr. St. Martin. He denied that Caleb ever said the word "sinus" to Dr. St. Martin. P.J. claimed that Dr. St. Martin had Caleb open his mouth, told him to breathe in, and commented that Caleb was likely suffering from a cold that was going around. According to P.J., this was the extent of Dr. St. Martin's examination of Caleb, after which Dr. St. Martin gave Caleb a prescription and told him to eat frozen pops. P.J. could not recall anyone giving Caleb a shot. P.J. also stated that Caleb continued to make short gasping breaths after leaving Dr. St. Martin's office, just as he did in Dr. St. Martin's office. P.J. testified that Caleb was still gasping lightly the next morning when he picked up his mother and Caleb.

Dr. St. Martin, however, testified that Caleb visited his office on October 31st because he was having symptoms of a sinus condition and to review the results of the MRI of his knee. Dr. St. Martin acknowledged that on the October 31st visit, Caleb's vital signs, including blood pressure, heart rate, and respiratory rate, were not taken and no numbers were recorded in the medical records for these vital signs. Dr. St. Martin could not explain why these vital signs were not taken that day. Despite Caleb's weight of nearly 300 pounds, Dr. St. Martin considered Caleb to be generally healthy, muscular, and in good physical shape.

Dr. St. Martin testified that, on the afternoon of October 31st, he observed Caleb as he was coming through the door from the waiting room into the hall. At that time, Caleb had one crutch but was not using it. Dr. St. Martin testified that, upon entering the examination room, he asked Caleb why he was there, and Caleb

12

told him he was having sinus-type symptoms, including sore throat, sinus pressure, and post-nasal drip. Dr. St. Martin stated that these were Caleb's only complaints and that Caleb did not mention his leg being a problem. Because Caleb did not complain about his leg, Dr. St. Martin did not examine Caleb's lower extremity, despite one of the purposes of the visit being to review the MRI of Caleb's knee.

According to Dr. St. Martin, he conducted a physical examination of Caleb in the fifteen to twenty minutes he spent with Caleb in the examination room. Dr. St. Martin examined Caleb's throat and ears, checked Caleb's neck glands to see if they were swollen, and listened to his heart and lungs with a stethoscope. The examination revealed that Caleb's throat was red and had drainage behind his tonsils, consistent with Caleb's sinus complaints. Dr. St. Martin determined that Caleb had a sinus infection and gave him a steroid injection, an antibiotic, and a sinus decongestant medication. Following the examination, Dr. St. Martin went over the MRI report with Caleb, which showed that Caleb had a patella tendon injury, and an appointment was made for Caleb to see an orthopedist.

Dr. St. Martin testified that at no time during his entire encounter with Caleb did either Caleb or P.J. tell him that Caleb was having problems breathing or that Caleb was short of breath. According to Dr. St. Martin, Caleb did not exhibit any signs of blood clotting or a DVT, such as leg pain, swelling, and redness to the extremity, and if Caleb did have such signs, he would have brought him to the hospital for appropriate tests and treatment. He also stated that Caleb did not exhibit any signs that he was at risk for developing a pulmonary embolism.

Dr. St. Martin's office staff corroborated Dr. St. Martin's version of Caleb's presentation on the afternoon of October 31st. Tanya Fick, Dr. St. Martin's medical assistant, admitted that she did not take Caleb's vital signs on October 31st

13

except for his weight, that she should have taken his vital signs that day, and that Dr. St. Martin told her she made a mistake not doing so.

The Allridges' expert, Dr. Keith Miller, who practiced family medicine for approximately 30 years, reviewed the medical records, depositions, and the coroner's report in this case. Dr. Miller testified that the process of developing a DVT and pulmonary embolus typically occurs over a period of time ranging from 24 to 36 hours. He also testified that the period between when the symptoms of either a DVT or pulmonary embolus should be recognized and the time of death is not instantaneous, but could take a number of hours up to a day or two. According to Dr. Miller, treatment could have easily been given during that window of time in this case. He agreed with the coroner's finding that Caleb suffocated after the DVT broke off and traveled to his lungs.

Dr. Miller also testified that Caleb had four risk factors for developing a DVT: (1) he had a traumatic injury to his knee; (2) he was obese; (3) he was immobile or sedentary due to his knee injury; and (4) he was African American and therefore more prone to the development of a DVT and a pulmonary embolism. Dr. Miller testified that these four risk factors should have caught Dr. St. Martin's attention.

Dr. Miller noted that the only vital sign taken on Caleb on October 31st was his weight. Dr. Miller testified that while Dr. St. Martin's records documented that Dr. St. Martin listened to Caleb's heart and lungs with a stethoscope, Dr. St. Martin did not testify that he counted Caleb's heart rate or respiratory rate when he listened to Caleb's heart and lungs. According to Dr. Miller, documenting a regular heart rate does not establish that Caleb had a normal rate; it only indicates that Caleb's heart rate was regular as opposed to irregular. While Dr. Miller acknowledged that a doctor can count the number of breaths a person is taking by

14

listening to their lungs long enough, Dr. St. Martin did not document an actual respiratory rate for Caleb.

Dr. Miller further testified that the standard of care for a family physician mandated that Dr. St. Martin or his staff take vital signs on Caleb during his October 31st visit. He opined that Dr. St. Martin should have taken Caleb's oxygen saturation rate with a pulse oximeter for three reasons: (1) it is a vital sign that the standard of care requires be taken on every patient; (2) it should be taken on any person who complains of respiratory problems, even sinus; and (3) had Dr. St. Martin taken other vital signs, some if not all of them would have been abnormal, such as an elevated pulse rate, blood pressure up and down, and a respiratory rate up. According to Dr. Miller, any person with abnormal vital signs should have their pulse oximetry taken. He explained that a low oxygen saturation as measured by a pulse oximeter is almost universally a symptom of a pulmonary embolism. Dr. Miller opined that had Dr. St. Martin used a pulse oximeter to measure Caleb's oxygen saturation rate, more likely than not, that one test would have changed the outcome of this case.

Dr. Miller opined that Dr. St. Martin breached the standard of care by failing to take Caleb's vital signs and that the breach caused the harm suffered by Caleb. He opined that, more likely than not, had Caleb's vital signs been properly taken, they would have been abnormal and would have shown an increased heart rate and an increased respiratory rate, which would have alerted a reasonable physician to intervene and get Caleb appropriate care. Therefore, Dr. Miller suggested that Dr. St. Martin should have (1) ordered further testing, such as a CT scan, which would have shown the presence of a pulmonary embolus, and (2) referred or consulted with the appropriate physicians and facility, most likely the nearest hospital, for the definitive care and treatment of Caleb. Dr. Miller believed that, to a reasonable

15

degree of medical certainty, any treatment Caleb would have received within the 18-hour period from the time he saw Dr. St. Martin until his death, including the delivery of oxygen, treatment with anticoagulation medication, or surgery, would have increased Caleb's chance of survival and would have greatly altered the outcome in this case.

Dr. Richard Abben, the defense's expert witness, was accepted by the court as an expert in the field of cardiovascular disease. He testified at length regarding how a DVT occurs in a case such as Caleb's and how it develops into a pulmonary embolism. Dr. Abben agreed with the following opinions and conclusions expressed by Dr. Miller: that the standard of care is to take vital signs on every patient who comes to a doctor's office for a sick visit; that neither Dr. St. Martin nor his staff attempted to take all of Caleb's vital signs on October 31st; and that it was a breach of the standard of care for Dr. St. Martin or his staff to fail to take Caleb's vital signs during the October 31st visit. However, Dr. Abben disagreed with the remainder of Dr. Miller's opinions and conclusions. He opined that Dr. St. Martin's failure to take Caleb's vital signs was not a breach of the standard of care in relation to the outcome in this case. According to Dr. Abben, had Caleb's vital signs been taken, they may not have revealed warning signs of a DVT or pulmonary embolism. Dr. Abben further opined that, more likely than not, Caleb was not experiencing a pulmonary embolism on that day, although Dr. Abben had no doubt that the DVT existed at that time. According to Dr. Abben, the key issue in determining whether the failure to take vital signs constituted malpractice is how Caleb appeared at the time Dr. St. Martin examined him. According to Dr. Abben, if Caleb exhibited the signs and symptoms that his family reported while Caleb was in Dr. St. Martin's office, specifically with respect to shortness of breath and a change in color, it would have been a breach in the standard of care for Dr. St.

16

Martin to not follow-up and do further investigation. Dr. Abben did not agree with Dr. Miller that if Dr. St. Martin had taken Caleb's vital signs that he could have potentially saved Caleb's life. Instead, he opined that it was substantially more likely than not that Caleb's pulmonary embolism occurred without any clinical precursor.

## ANALYSIS

Considering the entire record, we must now determine whether the trial court erred in failing to include a jury interrogatory as to whether Dr. St. Martin's actions caused Caleb the loss of a chance of survival. To establish a claim for medical malpractice, a plaintiff must prove the following by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached the standard of care; and (3) that the breach caused the plaintiff to suffer injuries. See La. R.S. 9:2794(A). Under Louisiana law, it is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. **Alphonse v. Acadian Ambulance Servs., Inc.,** 2002-0773 (La. App. 1st Cir. 3/28/03), 844 So.2d 294, 300, writ denied, 2003-1086 (La. 6/20/03), 847 So.2d 1240; **Hastings v. Baton Rouge Gen. Hosp.,** 498 So.2d 713, 720 (La. 1986); **Martin v. East Jefferson Gen. Hosp.,** 582 So.2d 1272, 1278 (La. 1991) (holding that the loss of chance of survival doctrine is intended to prevent medical malpractice plaintiffs from bearing the "unreasonable burden" of proving that the patient would have survived if properly treated).

In **Smith v. State, Department of Health and Hospitals,** 95-0038 (La. 6/25/96), 676 So.2d 543, the Louisiana Supreme Court acknowledged the "conceptual problem" presented by a pre-existing condition. As such, the **Smith** court stated that the "jury should focus on the damages that the defendant caused—

17

the loss of a chance of avoiding a death that might not have occurred if the health care provider had performed properly." **Id.** at 547 n.5. Therefore, the **Smith** court declared the loss of a chance of survival is a distinct compensable injury caused by the defendant's negligence, to be distinguished from the loss of life in wrongful death cases.[2] **Id.** at 547. The court acknowledged that full recovery for survival and wrongful death damages is not available for deprivation of a chance of survival of less than fifty percent and stated that to allow full recovery would ignore the plaintiff's inability to prove by a preponderance of the evidence that the malpractice victim would have survived but for the malpractice, which is a requirement for full recovery. **Id.** Therefore, a lost chance of survival due to medical malpractice caused by a defendant's negligence was recognized as a distinct compensable injury, valued as a lump sum based on all the evidence in the record. **Id.**

In **Braud v. Woodland Village L.L.C.**, 2010-0137 (La. App. 4th Cir. 12/8/10), 54 So.3d 745, writ denied, 2011-0311 (La. 4/1/11), 60 So.3d 1254, the Fourth Circuit addressed the trial court's failure to include jury instructions or interrogatories on the verdict form regarding lost chance of survival. In that case, the decedent, Mr. Braud, was diagnosed with Alzheimer's disease and Pick's Dementia. Mr. Braud's family became unable to care for him, and he was eventually moved to Woodland Village Nursing and Rehabilitation Center in New Orleans ("Woodland"). **Id.** at 748. Nearly a year later, Mr. Braud's wife notified one of his doctors, Dr. Simonson, that Mr. Braud had become quite "zombie-like"

---

[2] Where the evidence could support either a theory that the defendant's conduct caused the decedent's death (making full wrongful death damages appropriate) or a theory that the defendant's conduct caused the decedent a loss of a chance of survival, Louisiana law is clear that only one kind of damages or the other may be awarded. A jury may find the defendant liable either for causing the patient's wrongful death or for causing the patient's loss of a chance to survive, but not for both. **Coody v. Barraza**, 47,732 (La. App. 2d Cir. 3/6/13), 111 So.3d 485, 489, citing **Smith**, 676 So.2d 543; see also **Alphonse**, 844 So.2d at 301.

after a change in medications; in response, Dr. Simonson ordered the nurses at Woodland to perform checkups on Mr. Braud every 15 minutes to check for signs of distress of discomfort. **Id.** On the night of Mr. Braud's death, he was found unresponsive. The evidence established that either the checks were not performed or that Mr. Braud suffered a heart attack before the nurses realized. **Id.**

After submitting a complaint to the MRP, the plaintiffs filed a medical malpractice/wrongful death action against Dr. Simonson, Woodland, and the Louisiana Patient's Compensation Fund, in which they alleged negligence in failure to formulate an appropriate plan of care, improper administration of chemical restraints, and failure to attempt to immediately resuscitate, among other alleged acts of negligence. **Id.** at 749. Following a six-day jury trial, the jury found Woodland negligent in its care for Mr. Braud; Dr. Simonson was not found liable. **Id.** Woodland appealed and asserted that the jury erred in finding Woodland liable for wrongful death. It argued that the plaintiffs presented no evidence that would establish by a preponderance of the evidence that Woodland caused or contributed to Mr. Braud's fatal heart attack; at best, the plaintiffs only established a loss of chance of survival, which was not addressed in the jury interrogatories or final verdict form with no objection from the plaintiffs. **Id.** at 749-50.

The court, citing **Smith**, noted that the loss of a chance of survival is a distinct compensable injury caused by a defendant's negligence, distinguishable from the loss of life in wrongful death cases. **Id.** at 751. The **Braud** court found that "the inherent failure of the district court to provide proper jury instructions as to lost chance of survival led to a finding not supported by a reasonable factual basis." **Id.** at 751. The court noted that there was no evidence presented to the jury that showed any actions of Woodland caused Mr. Braud's fatal heart attack,

19

and therefore, there is no injury that Mr. Braud suffered that he would not have otherwise suffered. **Id.** at 751-52. Accordingly, the **Braud** court determined that the evidence could, at best, only establish a claim for a loss of chance of survival. **Id.** at 752. The court then found that the plaintiffs presented credible testimony at trial that the actions of Woodland's staff fell below the standard of care and that their failure to timely perform CPR on Mr. Braud denied him a chance of survival from his heart attack. **Id.** After summarizing the trial testimony, the court stated, "It is from the testimony of these individuals that we can surmise that the plaintiffs presented reasonable evidence to establish that [Woodland's] negligence prevented Mr. Braud from the opportunity to survive his heart attack. But it is equally clear that no actions or inactions of [Woodland] caused his fatal [heart attack]." **Id.** at 753. Therefore, the court found that the district court committed legal error in not presenting jury instructions and correct law as to "the separate and distinguishable claim for the loss of chance of survival" and concluded that "the district court committed legal error in failing to allow the jury to consider what clearly seems to be a case concerning the loss of chance of survival." **Id.** As a result, the Fourth Circuit remanded the matter to the trial court for a new trial with an instruction to include in its jury interrogatories the opportunity to consider a loss of chance of survival claim "as envisioned by the Louisiana Supreme Court in *Smith.*" **Id.**

In this case, the jury concluded that Dr. St. Martin breached the standard of care, which is reasonably supported by the evidence. Although there was conflicting evidence as to whether Dr. St. Martin's breach of the standard of care caused Caleb's death, the Allridges' case was also based on their contention that that the medical evidence overwhelmingly established that the breach denied Caleb

20

a chance of survival.[3] As in **Braud**, the jury was presented with evidence both supporting and controverting the Allridges' theory that Dr. St. Martin's negligence deprived Caleb the opportunity to survive the fatal pulmonary embolism. Such presentation of contradictory facts and expert testimony provides a basis for the inclusion of a jury interrogatory relative to the claim for loss of chance of survival.

The loss of a chance of survival doctrine is relevant in cases involving the following factual elements: (1) the death of the patient as the probable result of a pre-existing condition (i.e., a condition of the patient in existence at the time of the alleged malpractice of the defendant, which condition is unrelated to any conduct of the defendant); (2) some chance of the patient surviving the pre-existing condition, although a less-than-even chance, at the time of the defendant's alleged malpractice; and (3) the loss of all or a part of that chance of survival caused by the defendant's negligent action or inaction. **Deykin v. Ochsner Clinic Found.**, 2016-488 (La. App. 5th Cir. 4/26/17), 219 So.3d 1234, 1240-41, citing **Smith**, 676 So.2d at 547. Here, all of the medical experts agreed that, at the time of the October 31st visit, Caleb likely had a DVT that later broke loose and traveled to his lungs. Based on the evidence, particularly the testimony of Dr. Miller, Dr. St. Martin's negligence may have prevented Caleb from the opportunity to survive his fatal pulmonary embolism. Dr. Miller surmised that the taking of Caleb's vital signs would have revealed abnormalities such as increased heart and respiratory rate, thus alerting a reasonable physician to further investigate Caleb's condition. He further testified that any treatment given to Caleb within the 18-hour period between Dr. St. Martin's examination and his death would have increased his

---

[3] Although the Allridges' petition does not explicitly seek recovery for Caleb's loss of a chance of survival, no such specification is required. Louisiana is a fact-pleading state. Accordingly, a plaintiff in Louisiana is entitled to recover any relief to which he or she is entitled under the pleadings and the evidence. See **Miller v. Thibeaux**, 2014-1107 (La. 1/28/15), 159 So.3d 426, 432-33; La. C.C.P. art. 1154.

21

chance of survival. If the jury accepted this expert testimony and rejected the contradictory testimony of other experts, the jury could have found that Dr. St. Martin's negligence reduced Caleb's chance to survive the fatal pulmonary embolism.

On appeal, the Allridges argue that the jury interrogatories were defective due to the trial court's failure to include a causation interrogatory as to lost chance of survival. Question one on the jury verdict form asked whether the jury found that Dr. St. Martin breached the applicable standard of care regarding his treatment of Caleb, to which the jury answered in the affirmative. The next interrogatory asked whether the jury found that any breach of the standard of care by Dr. St. Martin caused Caleb's death. The jury answered this interrogatory in the negative. The jury's negative response to the second interrogatory concluded the jury's deliberations because the jury verdict form instructed that damages were to be awarded only if the jury answered the second interrogatory in the affirmative. Further, the only categories provided for damages were survival damages for Caleb's conscious pain and suffering, wrongful death damages for each of Caleb's parents, and special damages.

After the jury found Dr. St. Martin breached the standard of care, the jury interrogatories only provided an opportunity for the jury to consider whether there was a causal connection between Dr. St. Martin's breach and Caleb's death. They did not permit a finding as to whether Dr. St. Martin's breach of the standard of care denied Caleb a chance of survival, a separate compensable injury distinguishable from loss of life, despite the presentation of evidence to support this theory of recovery. As such, the jury interrogatories were so inadequate that the jury was precluded from reaching a verdict based on the correct law and facts. Further, the jury instructions failed to cure the inadequacy of the jury

22

interrogatories.[4] Accordingly, we find the trial court abused its discretion in failing to include a jury interrogatory as to lost chance of survival, and its judgment in accordance with the jury verdict should be reversed and this matter remanded for a new trial. See **Braud**, 54 So.3d at 754.

## CONCLUSION

For the foregoing reasons, the judgment appealed from is reversed, and the matter is remanded to the trial court for a new trial consistent with this opinion. All costs of this appeal are assessed to appellee, William H. St. Martin, MD.

**REVERSED AND REMANDED FOR NEW TRIAL.**

---

[4] The jury instructions provided that the Allridges were entitled to compensation for the damages sustained if they found (1) Dr. St. Martin breached his duty; and (2) that duty caused Caleb's death. As to lost chance of survival, the instructions merely noted that "[d]amages from wrongful death may include compensation for a loss of chance of survival." However, lost chance of survival is a separate compensable injury. Therefore, if anything, the charge related to loss of chance of survival may have further confused the jury. See footnote 2, *supra*.

23



STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2019 CA 1043

WILFRED ALLRIDGE AND JUANIKA ALLRIDGE

VERSUS

WILLIAM H. ST. MARTIN

In order to find reversible error in a jury's verdict based on an inadequate jury form, this court must find that the form is so inadequate that the jury is precluded from reaching a verdict based on correct law and facts. **Abney v. Smith**, 2009-0794 (La. App. 1st Cir. 2/8/10), 35 So.3d 279, 283, writ denied, 2010-0547 (La. 5/7/10), 34 So.3d 864. I disagree with the majority's conclusion that the absence of a special jury interrogatory on the loss of a chance of survival rendered the verdict form so inadequate that it precluded the jury from reaching a causation finding that is not supported by the evidence under all of the circumstances of this case.

A thorough review of the record reveals that from its inception, this case simply was not tried as a loss of chance of survival case. The Allridges' medical malpractice case was filed and prosecuted as a survival action and wrongful death lawsuit. The only damages the Allridges sought in the petition were survival and wrongful death damages. The record shows that prior to trial, on August 18, 2018, the Allridges submitted proposed jury instructions and interrogatories to the trial court. The first question asked whether Dr. St. Martin's actions or failure to act fell below the applicable standard of care in his treatment of Caleb. The second question asked whether Dr. St. Martin's actions or inactions caused damages to Caleb. The proposed form then listed ten items of traditional survival and

wrongful death damages, with a corresponding blank for a dollar amount. The Allridges did not assert a separate claim for loss of chance of survival until the presentation of evidence had been nearly concluded.[1]

In order to determine whether the jury interrogatory on causation was so inadequate that it precluded the jury from reaching a correct verdict on the law and facts in this case, all of the evidence must be reviewed. In addition to the evidence set forth in the majority opinion, the jury heard the testimony of Dr. Victor Tedesco, III, accepted by the court as an expert in the field of general surgery with a subspecialty in vascular surgery, who performed an autopsy on Caleb. Dr. Tedesco determined that Caleb died from a massive pulmonary embolism post-knee injury. He testified at length regarding the process by which a pulmonary embolism occurs. According to Dr. Tedesco, what usually happens and what happened in this case is that a blood clot, or DVT, formed in the veins in the lower extremity, which grew and propagated in the direction of blood flow. At some point, the clot broke loose and travelled in the vein, back to the heart, where it was pumped in the lungs and obstructed blood flow to the lungs. Effectively, the blood clot shut off the ability of the lungs to oxygenate blood. Dr. Tedesco explained that while it can happen sooner, it usually takes a week for a DVT to form, and he opined that Caleb probably had DVT more than a day or two before his death. However, he stated that the fatal embolus experienced by Caleb occurred "instantaneously." He later explained that when the clot did break loose, it would have been a matter of seconds until it reached the heart and embolized in both

---

[1] It is apparent that the prosecution of this malpractice claim as a wrongful death lawsuit was a tactical decision. Louisiana law is clear that whether a lawsuit is prosecuted as a wrongful death case or a loss of a chance of survival, only one kind of damages may be awarded. Traditional wrongful death damages may not be awarded in a loss of chance of survival case. **Coody v. Barraza**, 47,732 (La. App. 2d Cir. 3/6/13), 111 So.3d 485, 489. In a loss of chance of survival case, the only damages that can be awarded are the value of the lost chance, which must be proved by a preponderance of the evidence. **Smith v. State, Department of Health and Hospitals**, 95-0038 (La. 6/25/96), 676 So.2d 543, 547.

lungs, causing Caleb's death almost instantaneously. When asked whether it would have been useful to take proper vital signs within the day leading up to the fatal event, Dr. Tedesco stated that he did not know if that would have made any difference given that the clots he removed from Caleb's body were all part of the same event.

The testimony of numerous medical experts established that the standard of care is to take vital signs on every patient who comes into a doctor's office for a sick visit, that neither Dr. St. Martin nor his staff took all of Caleb's vital signs on October 31st, and it was a breach in the standard of care for Dr. St. Martin or his staff to fail to take Caleb's vital signs on the October 31st visit. However, the evidence was conflicting as to whether, in this case, if Dr. St. Martin had in fact taken Caleb's vital signs, he could potentially have saved Caleb's life. In order to determine whether Dr. St. Martin's failure to take Caleb's vital signs caused or contributed to Caleb's death or deprived Caleb of the chance to survive the pulmonary embolism that took Caleb's life, the jury had to first decide which version of the conflicting evidence regarding Caleb's presentation to Dr. St. Martin during the October 31st examination it believed.

Dr. St. Martin testified at length regarding his examination of Caleb. According to Dr. St. Martin, Caleb walked easily into his office and got up and moved around a few times during the visit. Dr. St. Martin emphasized that if a person of Caleb's size was having breathing problems, he would have noticed it. Dr. St. Martin testified that he examined Caleb's heart and lungs during the office visit. He explained that during a heart and lung examination, he observes how a patient is breathing and the patient's posture and listens to the heart with a stethoscope to assess the heart rate and rhythm. During the lung examination, Dr. St. Martin listens to the lungs with a stethoscope, has the patient breathe in and out,

3

and listens for signs of wheezing or fluid overload. Dr. St. Martin found that during his examination of Caleb's heart, Caleb had a regular heart rate and rhythm, and documented "RRR" to denote such in his notes on Caleb's cardiovascular examination. Although Dr. St. Martin was unable to provide an exact number for Caleb's heart rate, Dr. St. Martin testified that Caleb's heart rate was normal that day, stressing that if Caleb did have a fast heart rate, he would have uncovered that during his examination. While listening to Caleb's lungs, Dr. St. Martin found they were clear to auscultation and recorded that in the medical records. Dr. St. Martin testified that he did not hear any wheezing during the examination, nor did he detect any evidence of a rapid respiratory rate during the physical examination. Although Dr. St. Martin did not determine an actual number for Caleb's respiratory rate, he did conclude from his examination that Caleb had a normal respiratory rate. Dr. St. Martin testified that during his examination of Caleb, there were no signs that Caleb was at risk for developing a pulmonary embolism, noting that there was no evidence Caleb was having respiratory problems or was short-winded at the time of the examination.

Dr. St. Martin's office staff corroborated Dr. St. Martin's version of Caleb's presentation on the afternoon of October 31st. Monique Melum, Dr. St. Martin's receptionist, took the call for Caleb's appointment on October 31st and was told that Caleb had sinus, which she recorded. She testified that if the caller had reported Caleb was having breathing problems or chest pain, she would have instructed they go to the emergency room. Ms. Melum recalled seeing Caleb on October 31st and remembered that he was tall and "bulky." She stated that Caleb was not having problems moving around and was not having breathing problems that day. Following Caleb's visit, Ms. Melum took Caleb's co-payment. She testified that she was face-to-face with Caleb and that if he had any breathing

4

problems, she would have noticed it. She further stated that no one complained of Caleb having shortness of breath on that visit.

Tanya Fick, Dr. St. Martin's medical assistant, testified that during the entire time she saw Caleb at the office, no one told her Caleb was having trouble breathing and had they done so, she would have done a pulse oxygen test or would have gone to get Dr. St. Martin to see if Caleb should be at the emergency room. She further stated that something as severe as shortness of breath would have been documented in the medical records.

Caleb's brother, P.J., on whose testimony the Allridges relied to establish that Caleb was in respiratory distress at the time of the visit, gave significantly different accounts of his brother's condition and the extent of Dr. St. Martin's examination of Caleb on October 31st in a pre-trial deposition and in his trial testimony. The jury was presented with evidence that in a pre-trial deposition, P.J. testified that his brother was "gasping for air" in Dr. St. Martin's office on October 31st; however, at the trial, P.J. testified that he only saw Caleb gasp "a little" and could barely tell that he was having breathing problems. P.J. also gave conflicting testimony regarding whether Dr. St. Martin used a stethoscope during the examination.

As to whether Dr. St. Martin's failure to take Caleb's vital signs played any role in lessening Caleb's chance of surviving the fatal pulmonary embolism, the evidence presented to the jury was conflicting. Even the Allridges' expert, Dr. Miller, acknowledged that in the process of developing a pulmonary embolism, a person could show changes in vital signs or could show no changes in vital signs. Dr. Abben, who treated people with venous diseases on a daily basis and has treated people with pulmonary embolism conditions a few times a month, opined that Dr. St. Martin's failure to take Caleb's vital signs was not a breach in the

5

standard of care in relation to the outcome in this case. According to Dr. Abben, had Caleb's vital signs been taken, they may not have revealed what happened to Caleb the following day. Dr. Abben testified that a DVT does not affect a person's heart rate, blood pressure, respiratory rate, or oxygen saturation rate. He testified that the only signs or symptoms of a DVT in the leg is complaints of pain in the calf or thigh, swelling, and a warm feeling. Dr. Abben noted that Dr. St. Martin's medical records referenced knee pain, but not specifically pain in the calf or thigh. He further testified that symptoms of a pulmonary embolism are skin molting due to oxygen desaturation, altered consciousness resulting from a profoundly low blood pressure, coughing up blood, and pleuritic chest pain, which he described as similar to "a knife in your side." Dr. Abben stated that there was no indication in the medical records to suggest that Caleb was experiencing those types of symptoms. Dr. Abben agreed that based on Dr. St. Martin's actual physical examination of Caleb's lungs and heart with a stethoscope and Dr. St. Martin's recordation of Caleb's heart rate as regular and Caleb's lungs as clear, more likely than not, Caleb's vital signs would have been normal had they been taken on October 31st. Dr. Abben disagreed with Dr. Miller's opinion that if Dr. St. Martin had taken Caleb's vital signs, Dr. St. Martin could have potentially saved Caleb's life. Dr. Abben opined that it was unlikely that the failure to take vital signs contributed to the incredibly rare event that occurred in this case. He stressed that according to a world-renowned expert on DVT and pulmonary embolism conditions, a massive pulmonary embolism rarely occurs in young adults, and when it does, it is a tragic and unpredictable event, for which there are no good predictive measures.

Dr. Tedesco and Dr. Tebbe opined that Caleb's death was instantaneous, with the fatal event occurring very quickly and shortly. Dr. Tebbe testified that

6

even if Caleb had been in a hospital with people there to work on him when this event occurred, Caleb probably would not have survived. He opined that if Caleb was experiencing a non-fatal pulmonary embolism during the October 31st visit, Caleb would have had shortness of breath that continually increased after the visit, which the evidence presented to the MRP and did not show.[2]

One manner in which malpractice can contribute to a death is by lessening the chance of survival. **Benefield v. Sibley**, 43-317 (La. App. 2nd Cir. 7/9/08), 988 So.2d 279, 289, writs denied, 2008-2162, 2008-2210, 2008-2247 (La. 11/21/08), 996 So.2d 1107, 1108. In a loss of chance of survival case, a plaintiff does not have to prove that the patient would have lived had treatment been timely given; however, the plaintiff must establish that the defendant's conduct denied the patient a chance of survival. **Id.** Whether the malpractice contributed to the death is a question of fact for the jury. **Id.**

In a wrongful death action and an action predicated on the loss of a chance of survival, the plaintiff has the burden of proving causation by a preponderance of the evidence. To recover under either a wrongful death or loss of chance of survival theory, the Allridges were required to demonstrate that there was some action or inaction on Dr. St. Martin's part that caused harm to Caleb. In this case, the causation inquiry was the same under either theory of recovery: did Caleb exhibit signs of respiratory distress during the October 31st visit, such that Dr. St. Martin should have recognized the possibility that Caleb was in danger of developing a pulmonary embolism, and if so, did Dr. St. Martin's failure to intervene and order additional testing or further medical treatment to confirm that

---

[2] The evidence presented to the jury also did not show that Caleb was having increased shortness of breath following the visit to Dr. St. Martin. P.J. testified that he asked Caleb later that evening if he was having trouble breathing because it was not noticeable.

7

condition cause or contribute to Caleb's death by decreasing his chance of surviving the fatal pulmonary embolism?

The jury was presented with evidence that Dr. St. Martin breached the standard of care by failing to take Caleb's vital signs because taking vital signs is the standard of care on every patient who presents complaining of illness, including sinus issues. However, whether that failure caused or contributed to the fatal pulmonary embolism that took Caleb's life was highly contested at trial. The Allridges' theory of the case, supported by their lay and medical testimony, was that: (1) Caleb was having difficulty breathing at the time of the visit and Caleb told Dr. St. Martin and his staff that he was experiencing shortness of breath; (2) Caleb's respiratory condition should have prompted Dr. St. Martin to take certain vital signs, and if those vital signs had been taken, they would have shown a low oxygen saturation rate, increased heart rate, and an increased respiratory rate; (3) those abnormal vital signs should have alerted a reasonable physician to intervene and get Caleb appropriate medical care, and (4) that medical care would have increased Caleb's chance of surviving the pulmonary embolism.

The defense's theory of the case, supported by its lay and medical testimony, was that: (1) Caleb did not exhibit any signs of respiratory distress during the October 31st visit; (2) based on Dr. St. Martin's actual physical examination of Caleb's lungs and heart with a stethoscope and his recordation of Caleb's heart rate as regular and Caleb's lungs as being clear, more likely than not, had Caleb's vital signs had been taken and recorded, they would have been normal; (3) there was nothing in Caleb's presentation to Dr. St. Martin during the October 31st office visit that would have prompted a reasonable physician to suspect Caleb had a DVT or was in the process of developing a pulmonary embolism and order additional medical intervention; and (4) it was highly unlikely that Dr. St. Martin's failure to

8

take and record Caleb's vital signs contributed to the incredibly rare and unpredictable event that occurred in this case, as the type of massive pulmonary embolism Caleb experienced is exceeding rare in young adults, was an instantaneous event for which there were no good predictive measures, and there was nothing a reasonable physician could have done to predict or prevent the fatal embolism that took Caleb's life.

The jury's causation determination in the wrongful death action demonstrates that it repudiated the Allridges' theory of the case and accepted the defense's theory of the case. In reaching this decision, the jury obviously found that as a fact that Caleb did not did not exhibit signs of respiratory distress during the October 31st visit; if Dr. St. Martin had taken and recorded Caleb's vital signs they would have been normal; there was nothing in Dr. St. Martin's examination of Caleb or in Caleb's presentation that should have alerted Dr. St. Martin to suspect Caleb had a DVT or pulmonary embolism such that additional testing would have been required; and no medical professional under these circumstances could have prevented Caleb's death or gave him a better chance to survive the fatal pulmonary embolism. In finding Dr. St. Martin did not commit malpractice in his treatment of Caleb, the jury simply chose to accept Dr. St. Martin's and his staff's testimony, as well as the testimony of the coroner and the opinions of three medical doctors, over that of Caleb's family members and the opinion of Dr. Miller. The jury verdict form and answers to the jury questions confirm the choice made by the jury based on the facts presented to them.

Once the jury rejected the Allridges' theory of the case in the wrongful death action, it would have been inconsistent and legal error for the jury to then render a different causation ruling on a loss of a chance of survival claim. Both malpractice theories in this case are based on the same operative facts. Upon

9

rejecting the factual scenario advanced by the Allridges in the wrongful death action, the jury could not have reasonably found that Dr. St. Martin's action or inaction deprived Caleb of any chance of surviving the fatal pulmonary embolism.

Yet, the majority concludes that **if** the jury accepted Dr. Miller's testimony and rejected the contradictory testimony of the other experts, the jury could have found that Dr. St. Martin's breach of the standard of care reduced Caleb's chance to survive the fatal pulmonary event. The problem with this conclusion is that the verdict rendered in the wrongful death lawsuit demonstrates that jury **did not** accept the testimony offered by the Allridges. At the second trial Dr. St. Martin will have to defend, one can expect that all of the same evidence will be adduced, and the jury in the loss of chance of survival case will be required to make the same credibility determinations on the causation issue as the jury in this wrongful death lawsuit was required to do. The new jury will have to choose between conflicting evidence as to whether Caleb in fact exhibited signs of respiratory distress during the October 31st visits before it can find that anything Dr. St. Martin failed to do during that examination deprived Caleb of the chance of surviving the fatal pulmonary embolism.

For these reasons, I am convinced that the trial court's failure to present the jury with an additional instruction regarding the loss of a chance of survival did not lead the jury to render a causation finding that is not reasonably supported by the record. The jury's verdict did not result from a defective verdict form, but from its choice between the conflicting factual testimony and expert medical opinions. Where there are two permissible versions of the evidence, the jury's decision to accept one over the other cannot be legally erroneous. See **Stobart v. State, Department of Transportation and Development**, 617 So.2d 880, 883 (La. 1993).

10